Our second case this morning is Gillick v. Saddler. That's case number 411-1117 for the appellate Thomas Kelty for the appellate Clifford Burlow. Mr. Kelty, please proceed. Good morning and thank you. This case arises out of a dispute over whether or not the defendants are legally obligated to disperse the plaintiff a sum of $53,091.67 plus accrued interest, which is the unpaid balance of a Federal Arbitration Panel award made to plaintiff. Plaintiff Michael Gillick is a blind vendor who operated a vending facility at a postal facility in Chicago, Illinois. Subsequent to the plaintiff undertaking the vending service, the postal service leased space in the same facility to another vendor who was not a blind vendor. Ultimately, the Arbitration Panel determined that the vendor in the other space was a quote-unquote direct competitor to the plaintiff. As a result of its findings, the Arbitration Panel awarded the sum of $237,207.11 to be dispersed in accordance with the provisions of the Randolph-Shepard Act. That Act was created exclusively to provide, and I quote, blind persons with remunerative employment, enlarging economic opportunity for the blind, and stimulating the blind to greater efforts in striving to make themselves self- profitable. I'm not sure I understand your question, Your Honor. Well, my question is, your client gets so much money, but there is a cap on that, and when we get above that cap, the excess is dispersed to the appropriate state agency, which is what the defendants in this case intend to do, or have done. So why is that not dispositive? My answer, Your Honor, 34 C.F.R. section 395.32, lowercase j in parens, and I'll quote. This is from the Arbitration Panel language. Even if this panel determined the break-even policy did not violate the Act, however, there is another basis for ruling in favor of the complainant in this case. The permits between the parties clearly mandate that the income sharing for all vending machines in the United States is more than is required under the general provisions of the Act. The regulations permit arrangements which allow blind vendors to receive a greater amount of vending machine income than is required under the Act. That's why it's not dispositive. That's the exception. If anything, this language is dispositive in this case. Okay, give me that side again. 34 C.F.R. section 395.32, lowercase j in parens. Okay, so you're saying then subsection j completely then abrogates subsection b of the same section you're citing, 34 C.F.R. section 395.32? That's correct. What does subsection b mean then? Well, it means that there are ceilings that apply subject to certain exceptions. One of the exceptions is 32 J. And the substance of the distinction, Your Honor, is the existence of an arrangement and the arbitration panel found was that the permits, the permit and the licenses and other attachments to that permit constitute an arrangement under sub-paragraph J. So your client has a side arrangement, I don't mean that pejoratively, but an agreement, a side agreement or arrangement that says, and it's being recognized, there's a cap, but the cap isn't going to apply to you for whatever reason, because of the building you're in or because of the competition you're against or some contract negotiated principle or principle negotiated in the contract, we're going to give you, or you're entitled to 100%. That's correct. And if we didn't have a side, and you're saying impliedly, if we didn't have this side arrangement, then you would be subject to the cap. Subject to the cap. I'm not conceding that. There may be a problem with the cap. But there may be issues with the cap. But if there are no issues with the cap, the cap is on the books and it ought to apply to you unless we have this separate agreement. That's correct. Okay. At the end of the day, it's this separate arrangement that I believe, the arbitration panel recognized it for what it is. I believe this court should recognize it for what it is. I'll concede that it's a quite complicated statute to read. I've seen much better. Okay. You're going to have to help walk me through this. What is this separate arrangement? The separate arrangement is the permit that's issued by the state agency to my client, Mr. Gillick, to operate his vending facility in that particular postal facility in Chicago. Okay. And what's the permit say? It says that the limitations don't apply, I presume. If I'm following your argument, that's what his permit says. I'm paraphrasing, Judge. It says he's entitled to 100% distribution from that facility. And in this case, when there's a direct competitor, which gets into the general language of statutes itself, the ace company that was operating the other facility was deemed by the arbitration panel to be a direct competitor. And it flows through. As I said, it's rather difficult to read, but that's how it is. Does this permit itself acknowledge that we're doing away with the cap? Or is the permit that you're relying upon simply used the 100% language? I don't believe that it refers to the cap itself, Judge. Okay. Well then, in order to negotiate something that's going to be an exception, or is going to be a special permit, wouldn't it have to be mentioned? Otherwise, why doesn't the permit simply track what the expectation is? Yeah, it's 100%, but we've got this other federal regulation over here that says, well yeah, but if it exceeds what would be a fair profit from some perspective, then there's a cap on it, and the rest of it goes back into a fund that helps other individuals that might be in your situation or provides programming for vision impaired individuals. Generally, Judge, as I recall from the permit itself, it's in the record here somewhere, that the agreement is subject to the provisions of the regulations. Right. And section 395.32 and all the subsections, and that one of the subsections is subject. So it doesn't... Well, any permit that would be given would be that way, wouldn't it? I mean, I want to understand whether your theory of the case is my client was treated with a degree of specificity, and he gets this exemption, and everybody knew from the beginning that's what he was getting, or whether you're advancing this theory based upon perhaps not construing all these regulations or statutes together. I want to make sure I understand what you're saying. I am construing the entire act. I go through the Randolph-Shepard Act, which is the Federal Enabling Act, or the Federal Act, the State Enabling Act, and the regulations that are adopted by the Commissioner of AGW. You obviously know more about this than we do, either because you're smart, or because you've done this before. Maybe both. Are there other clients, or are there other potential clients, or are there individuals who also have this permit? What I'm really asking is, out in the real world, was this permit on purpose to give your client a good deal, which maybe he that the feds were not careful enough with the permit if they really wanted the cap to apply? Judge, I don't think that's the case, and I really can't speak to how common this is, but it's a foreign permit, and if you read the permit by itself, it's not going to get into this. The attachments and the exhibits expand upon the basic permit. So anybody could get a permit, go in and operate, but the distinction is where you have a blind vendor, then there are certain conditions that are set forth either directly in the permit or in the attachments. But is this a condition that's set for every permit issued to a blind person? In other words, are you asking us to interpret this in such a way that every permit that a vendor receives, where that vendor is vision impaired or blind, they would be able to make the same argument because of the language of the regulation? I don't believe so, Judge. I think the language of the regulation and what brought this whole case about is the direct competitor. If you have a permit, no direct competitor, this issue never arises. But here you have a direct competitor, which brings into play the 100 percent distribution language, I think it's in 107D-1B of the Act, which then, you know, it segues through its language, Judge, into this limitation. There's an initial limitation, which reading by itself says a ceiling can be imposed by the director or the regulations, which in turn state a limitation. But that limitation is bypassed if you're dealing in the case of a direct competitor situation. And then the direct competitor issue segues into, is there something in this whole thing that distinguishes the combination of the direct competitor and the permit that constitutes an arrangement? And that is what gets us to the bottom line of subpart J. So a generalized head note might read, a blind vendor who has a direct competitor is not subject to the cap and the regulations. If the blind vendor has a special arrangement with the department. Okay, well that gets me right back to where we were five minutes ago. What is the separate special arrangement that your client had with the department? It's the permit, Judge. What does the permit say as to a special arrangement? I'll give it a moment. Okay, sure. Okay. It's found, Your Honor, that 8-68 of the separate appendix is an application and permit for the establishment of any facility subject to the act that we've been discussing. It states, in part, the type and location of each vending machine located on this property, referring to the Chicago property, and the specific income-sharing provisions in 34 CFR 395.32 applicable to each machine will be indicated in attachment F. Vending machine income will be dispersed to the state licensing agency on at least a quarterly basis unless it is mutually agreed otherwise. Let's see the attachments, Judge. Is that all right to say? Well, are you saying there are attachments that describe the special arrangement that waives the 395.32? Yes, Your Honor. Okay. Can you, obviously you can't quote it, but generally describe to me what those attachments indicate? Do they simply say the limitation in subsection B does not apply to the permit that we are hereby granting you? I can't speak to that from memory, Judge. I'll have to look at the attachments. If they don't say that, do you lose? If they don't make specific reference to the subsection of the statute? Yes. No. You have to read all of section 395.32 in its entirety. All these sections are interwoven with limitations, ceilings, exceptions, limitations. Well, I have read it and I guess my interpretation of it is different than yours, although I'm open-minded. But as I understand your argument, you're saying subsection J overrules subsection B because your client had a special permit which says so. Am I correct? Is that basically the essence of your argument in your briefing here today at Orals? Innocent, yes. Okay. Well, if I'm mischaracterizing it, this is your chance. Explain to me why. Because when you say, in a sense, it sounds like you have a bit of a question of whether I'm actually understanding what you're arguing to us. Well, I understand your question, Judge. I unfortunately do not have the attachments. I thought that I filed them in the record. I didn't, apparently. Or if I did, I can't locate them right now. Well, okay. I'm not trying to give you a hard time. I'm trying to understand the theory. You've indicated just assignment. Even without the attachments, your client, I think, your argument would prevail. Expand on that as much as you can, the time you have left, and of course you'll have rebuttal after you're finished here. I think what I said, Judge, was in the absence of the special arrangement, I'm not willing to concede that under the other provisions and interpretations of the Act, that it's a foregone conclusion. Okay. So you're saying if we read that, the section we both referenced, in total, your client, in your view, still has a right to 100% of the funds collected? Okay. Which is what the arbitration panel ruled, that 100% distribution. And it didn't say, you know, 100% subject to anything. It just said 100%. So, you know, the argument of the State is, well, you've got the 100% limitation. My argument is you've got an agreement that says otherwise, notwithstanding, in addition to the decision of the order of the arbitration panel that recognizes specifically that 395.32j is dispositive when reviewing the permit and all the attachments in their entirety. Okay, Mr. Kelty, you'll have rebuttal. I'll have Mr. Berlow. May it please the Court, my name is Cliff Berlow. I'm an Assistant Attorney General, and I'm here on behalf of the Secretary for the Illinois Department of Human Services and the Illinois State Treasurer. I want to focus in what I think was the thesis of my colleague's separate arrangement that existed, which exempted the plaintiff here from section 395.32. And what the plaintiff has cited this morning are two sources. First, a paragraph in the decision which appears at page 849, at A49 of the appendix. And then separately, the permit that appears at page A68. And I think let's just take those one at a time. I think it'll become very clear that there's nothing in this record that indicates that there is any exception. If you look first at page A49 and A50, the plaintiff quoted on A50, this paragraph in the middle of the page, which if you'll permit me, reads, even if this panel were to find that the break-even policy, and I'll come back to that, did not violate the Act, there is another basis for ruling in favor of the complainant in this case. The permits between the parties clearly mandate that the income sharing for all vending machines in the cafeteria is at 100%. What's critical here is that the court was addressing what was called the break-even policy, which was a position that the U.S. Postal Service had advocated for in the arbitration hearing. The break-even policy was essentially a way for the Postal Service to argue, not that it didn't have to share income, but that there was no income to share because the Postal Service was entitled to recoup its overhead before dispersing profits through 395.32. It has nothing to do with recognizing an exception to the income ceiling in 395.32b. The context of the language here is critical, and there's simply no way of reading that as a definitive declaration that there was a separate arrangement that eviscerates the default rule, which is the cap. The second point here that my colleague has cited this morning is the permit. As you can see, and I think as the court discussed, there is nothing in this permit which specifically mentions 395.32b, 395.32j, or anything about the income ceiling. Now, allegedly there is an attachment F that would be attached. It was not introduced in the trial record below. It's not in the record here, at least I certainly haven't seen it. So, if the plaintiff's argument comes down to what is in this attachment F, you would think that the plaintiff would have introduced it into the court. So, when you take away this idea that there was an arrangement to this overarching rule, I think what we're left with is the plaintiff's theory here, which is I think more spelled out in its brief than an argument here today, which is the very idea of a cap in a direct competition case is antithetical to the aims and goals at the heart of the statute. And that's simply incorrect. The statute exists to provide members of the visually impaired community economic opportunities, and it does that in two ways. Members of the visually impaired community, does that mean blind guys? That would mean blind guys. Just, you know, I didn't get the memo and I want to make sure we're conversing in the same language. I will shorten it up to move this along. Good. The members of the blind community, it does it in two ways. First, it facilitates their ability to own and operate these vending machines and vending facilities in federal buildings. And the second is it provides a mechanism for funding retirement programs and health care programs for participants in blind vendor programs. The idea of an income cap, or income sharing cap, exists to help fund the health care and retirement programs. This case is not about whether or not the plaintiff is entitled to this money. The question here, it's not about whether the state is entitled to this money, as the $53,000 is earmarked for providing health care and retirement benefits for all participants in the program or for the plaintiff's pocket. And I think it's very clear that no matter how many times the plaintiff repeats the phrase 100%, 100%, 100%, it doesn't repair the fact that there are in the regulation after the phrase 100%. And they say, provided that, the amount of income sharing does not exceed a maximum amount. And there is simply no way of reading the second half of a single sentence out of the statute and out of the regulations. And if the court doesn't have any other specific questions either about this issue or about sovereign immunity, I'm happy to rest on my breath. Seeing none, thank you, counsel. Appreciate the argument, and we'll have rebuttal now. Thank you, Your Honor. At 8-31 of the separate appendix, there is an excerpt from the arbitration panel word that quotes attachment F, which I don't think to the agreement with Mr. Gillick. And it says as follows, no other vending machine satellite area is operated by other than the Department of Rehabilitation Services Vending Facility Program, period. If vending machines in other vending areas are operated by another service company, then all machines are competing vending machines. The income sharing for all 395, section 395.32, small a and friends. Vending machines which would be located in the cafeteria area will be at the 100% income sharing. That 395.32 is where the regulations begin that dictate all of these ceilings and limitations. Who received the permit? Who received the permit? Mr. Gillick. Was there a difference between being a vendor and a holder of the permit? Because the permit application is not by Mr. Gillick. Well, the permit, he's a vendor under the permit, Judge. I can say that's what... Would the Postal Service care if the entity that applied for the permit changed the vendor to another blind person? Under the circumstances, Judge, I think that's an issue. Well, I mean, did he have to make a new application? No. Okay. Yeah, he's operated under that permit. Okay. Thank you. I would just make a few points, John. Your Honor, although they weren't raised by counsel directly, there is a distribution letter which is found in the record by a certified public accountant, Deborah Ringer, which is her interpretation of how these funds should be distributed. And I would suggest that the Court, in reading that letter, that is simply her implementing the Department's interpretation of what they believe, which is contrary to what I believe. Okay. In conclusion, it's the clear intent of the Act to give preference to blind vendors. Mr. Gillick has been a blind vendor since, I think, the early 1990s. This is an issue over which he had no control because the State of Illinois has only decided for them not to seek arbitration, which they did well after the fact. And the arbitration order says what it says. It was never appealed. It's final. And I think now it's just an interpretation of what 395.32, including subparagraph J, has to say. So I thank you for your attention. I'll answer any questions. Okay. Thank you, Mr. Fialti. Thank you, Mr. Berleau. The case is submitted and the Court stands in recess.